1    QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
       Claude M. Stern (Bar No. 96737)
2      claudestern@quinnemanuel.com
       Evette D. Pennypacker (Bar No. 203515)
3      evettepennypacker@quinnemanuel.com
       Andrea Pallios Roberts (Bar No. 228128)
4      andreaproberts@quinnemanuel.com
     555 Twin Dolphin Drive, Suite 560
5    Redwood Shores, California  94065-2139
     Telephone:     (650) 801-5000
6    Facsimile:     (650) 801-5100

7    Attorneys for Defendants The Walt Disney
     Company, Walt Disney Pictures, Disney Book
8    Group, LLC, Pixar, and Disney Enterprises, Inc.

9                        UNITED STATES DISTRICT COURT

10                    NORTHERN DISTRICT OF CALIFORNIA

11                            OAKLAND DIVISION

12   Deborah J. Thomas,                        CASE NO. 4:07-cv-4392

13               Plaintiff,                    **NOTICE OF MOTION AND MOTION TO
                                               DISMISS PLAINTIFF'S FIRST
14          vs.                                AMENDED COMPLAINT;
                                               MEMORANDUM OF POINTS AND
15   The Walt Disney Company, Walt Disney      AUTHORITIES IN SUPPORT THEREOF**
     Studios, Disney Press, Pixar Animation
16   Studios, Walt Disney Feature Animation, Walt   Date:       December 20, 2007
     Disney Pictures, Disney Enterprises, Inc., and  Time:       2:00 p.m.
17   DOES 1 through 100, Inclusive,            Place:      Courtroom 2
                                               Judge:      Hon. Claudia Wilkin
18               Defendants.

19

20

21

22

23

24

25

26

27

28

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on December 20, 2007 at 2:00 p.m., or as soon thereafter as the matter may be heard, in the above-entitled Court, located at 1301 Clay Street, Suite 400 South, Oakland, California, Courtroom 2, The Walt Disney Company, Walt Disney Pictures (also sued as Walt Disney Studios and Walt Disney Feature Animation), Disney Book Group, LLC (sued as Disney Press), Pixar (sued as Pixar Animation Studios), and Disney Enterprises, Inc. (collectively "Defendants"), and each of them separately, will and hereby do move the Court for an order dismissing with prejudice Plaintiff Deborah J. Thomas' ("Plaintiff's") First Amended Complaint ("FAC") pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).

This motion to dismiss with prejudice is made on the grounds that: (1) Plaintiff's claim for relief under California Business & Professions Code § 17200 is preempted by Section 301 of the Copyright Act (17 U.S.C. § 101 et seq.); (2) Even if Plaintiff's Section 17200 claim was not preempted, it would be time barred (Cal. Bus. & Prof. Code § 17208); (3) Plaintiff's copyright claim is time barred (17 U.S.C. § 507); and (4) Plaintiff's alleged copyrighted work and Defendants' allegedly infringing work are not substantially similar as a matter of law.

This motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities filed concurrently herewith, the Request for Judicial Notice in Support of Defendants' Motion to Dismiss Plaintiff's First Amended Complaint, the Declaration of Andrea Pallios Roberts in Support of Defendants' Motion to Dismiss Plaintiff's First Amended Complaint, the pleadings and other papers on file in this action, and such additional evidence as may be presented at or before the hearing.

DATED:  November 15, 2007          QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP


By   /s/
     Claude M. Stern
     Attorneys for Defendants The Walt Disney
     Company, Walt Disney Pictures, Disney Book
     Group, LLC, Pixar, and Disney Enterprises, Inc.

## MEMORANDUM OF POINTS AND AUTHORITIES

### Introduction

This lawsuit should have never been brought.  The FAC is Plaintiff's latest of several attempts to state a claim for relief against the Defendants and it, like Plaintiff's previous attempts, is utterly devoid of a single viable claim.  Plaintiff attempts (for the third time) to allege an unfair competition claim based on her allegation that she unilaterally submitted her literary work "Squisher the Fish" to Defendants and that Defendants *copied* that work and incorporated it into the hugely popular motion picture "Finding Nemo."  However, Plaintiff admits that she communicated no information to Defendants other than to unilaterally submit her work to them and that Defendants communicated nothing to her other than to tell her that it is their practice not to accept outside submissions.  Plaintiff's unfair competition claim is simply preempted by federal copyright law, a result Plaintiff cannot escape.

Plaintiff's copyright claim — the only claim she can possibly bring based on the set of facts she alleges and one she only added after attempting to make a futile motion to remand her state law unfair competition claim — also completely fails.  Plaintiff admits that she viewed the motion picture "Finding Nemo" in theaters on June 6, 2003.  The copyright act allows a plaintiff to wait three years before filing an infringement claim, not more.  Plaintiff did not file this lawsuit until May 29, 2007 — nearly four years after she viewed "Finding Nemo" in theaters.  Plaintiff's copyright claim is therefore clearly barred by the statute of limitations and should be dismissed on that ground alone.

Even if Plaintiff could somehow side step these fatal procedural flaws in her two claims for relief, the Court would still be compelled to dismiss her FAC because Plaintiff's work "Squisher the Fish" and the motion picture "Finding Nemo" are not substantially similar.  In fact, the two works are completely different from one another, and no reasonable trier of fact could conclude that Defendants copied Plaintiff's work.  Plaintiff's copyright deposit reveals a short, high level treatment of a young fish swimming around in the ocean who falls in love, is captured by a diver and lives happily ever after in a public aquarium.  "Finding Nemo" is a full length animated feature film in which an overprotective father journeys through the ocean to find his lost son and,

1   in the process, learns to relax and let his son experience life.  The only similarities between

2   Plaintiff's and Defendants' works are that they involve fish swimming in the sea.  The idea of a

3   story about fish with personalities is not protectible as a matter of law.  Plaintiff's FAC

4   demonstrates unequivocally that Plaintiff has not stated and will never be able to state a claim for

5   relief against Defendants, and her FAC should be dismissed with prejudice.

6                                   **Factual Allegations**

7

8       **The Motion Picture "Finding Nemo."**  Plaintiff claims that the Defendants copied her

    work "Squisher the Fish" and incorporated it into the motion picture "Finding Nemo."  (FAC ¶24.)

9   "Finding Nemo" was a hugely popular animated film that was generally released to the public in

10  theaters on May 30, 2003.  (FAC ¶26.)  Plaintiff admits that she viewed the film in a theater on

11  June 6, 2003.  (FAC ¶27.)  Plaintiff does not attach the film to her FAC, but she refers to and relies

12  upon it and it is central to her claim, so the Court may consider the DVD copy of the film filed by

13  Defendants.  (Request for Judicial Notice; Declaration of Andrea Pallios Roberts in Support of

14  Motion to Dismiss Plaintiff's First Amended Complaint ("Roberts Dec."), Ex. U.)

15      "Finding Nemo" is an underwater ocean adventure about the relationship a clownfish

16  father named Marlin (shown at left) has with his clownfish son Nemo (shown at right) after

17
      Nemo's mother Coral and all of Marlin's other children are
18
                          tragically killed by a barracuda fish when Nemo is just an   
19
                          egg.  In the beginning of the film, Marlin promises Nemo
20
                          (who is still an egg) that he will never let anything happen to him.
21
                              The story leaps to Nemo's first day of school.  As a result of his
22
23  encounter with the barracuda fish when he was an egg, Nemo has a deformed fin that causes him

24  to swim more slowly than other fish and reinforces Marlin's extreme overprotectiveness.  It is

25  clear from the interactions between father and son that, so far, Marlin has kept to his promise to

    Nemo and has not let anything — bad or good — happen to his son.  Embarrassed and annoyed by
26
    his overprotective father, Nemo deliberately disobeys Marlin by swimming out into the open
27
    water, and Nemo is captured by a diver and taken to a fish tank in a dentist's office.  Nemo
28

befriends the other creatures in the tank (shown at right), who help him concoct escape plans so he can return to the ocean and his father. These other fish also help Nemo build confidence in himself despite his deformed fin.



Meanwhile, Marlin is frantic that his only son is missing. He befriends a blue tang fish



named Dory (shown at left) who helps him discover that Nemo was taken to Sydney, Australia. Dory is a friendly, upbeat fish that suffers from short-term memory loss. Nemo and Dory travel to Sydney on the East Australian Current, during which time Dory teaches Nemo to be more carefree. Along the way, Marlin and Dory meet a club of fish-friendly sharks (including one named Bruce) who chant "Fish are friends. Not food," escape anglerfish, play their way through a school of jellyfish, travel with sea turtles who talk like surfers (including Crush and his son Squirt), and are swallowed by a whale. Through these experiences, Marlin and Dory become deeply close friends, and Marlin learns that he needs to let things happen to his son (and to himself) in order to grow and experience life.

Back at the fish tank, Nemo hears of his father's travels from a pelican named Nigel (shown at right) and tries to escape from the fish tank again. When the dentist puts Nemo into a plastic bag to give Nemo to his niece (a little girl who is known to kill her pet fish),



Nemo pretends to be dead, hoping the dentist will flush him down the toilet so he can return to the ocean and his father. The plan does not work, and Nemo is instead thrown in the trash can. One of Nemo's fish tank friends saves him and helps him escape through the spit sink next to the dentist's chair. Back in the ocean, Nemo reunites with his father. The two return home with Dory and the film ends with Nemo going to school and Marlin telling him to "go have an adventure."

**Plaintiff's "Squisher the Fish."** Plaintiff alleges that she "created an original literary work entitled 'Squisher the Fish'" in the summer of 2000. (FAC, ¶ 14.) Plaintiff's FAC does not provide any detail about her literary work that she alleges Defendants copied. (*See generally*

1   FAC.)  The Court, however, may take judicial notice of Plaintiff's copyright deposit for "Squisher

2   the Fish," on file and publicly available with the United States Copyright Office, and consider it

3   on this motion to dismiss.  (Request for Judicial Notice; Roberts Dec., Ex. T.)

4          Plaintiff's work is purely text.  (Roberts Dec., Ex. T, at 1.)  There are no pictures or

5   drawings and only very limited descriptions of the characters.  The entire piece is approximately

6   11 pages long.  In those pages, there are at least two songs (or poems), one of which is an entire

7   page.  Many parts of the work rhyme.

8          Plaintiff's story is about a fish named Squisher who lives in the ocean.  Squisher is not a

9   clown fish, but rather "[a] beauty of an Angelfish, a Rock Beauty that is."  (Roberts Dec., Ex. T, at

10  1.)  Squisher is described as a young, tiny, yellow fish, with a blue circle somewhere on his body.

11  (*Id.*, at 1 and 5.)  Squisher's parents are never discussed in Plaintiff's work.

12         The story begins when Squisher is born and makes friends with Glen.  (Roberts Dec., Ex.

13  T, at 1.)  Glen teaches Squisher about the ocean, love, and to stay away from divers.  (*Id.*, 1-3.)

14  Glen takes Squisher to work at a reef cleaning station, where Squisher meets William the Neon

15  Goby, "a chubby young Grouper called Mr. Grubbs," and Dot, another Rock Beauty.  (*Id.*, at 4.)

16  Squisher and Dot fall in love and play with their companions, Glen and Glen's love Emily.  (*Id.*, at

17  5-6.)  During the course of Plaintiff's 11-page story, Squisher swims in a reef and meets or sees a

18  spotted moray eel, a loggerhead turtle named Frankie, and a school of tangs.  (*Id.*, at 3, 5.)  At the

19  end of Plaintiff's story, Squisher and Dot are caught by divers and Squisher is put in a public

20  aquarium.  (*Id.*, at 6-8.)  Squisher does not try to escape.  (*Id.*, at 8.)  He is content: "Squisher was

21  home at last!  He was safe and happy to be protected from harm.  He is the king of his world, in

22  this public aquarium."  (*Id.*)  None of Squisher's undersea friends try to find him.  The story ends

23  with Squisher happily living in the public aquarium. (*Id.*)

24         **Plaintiff's Allegations of Copying.**  Plaintiff alleges that she submitted her "Squisher the

25  Fish" work to Defendants on or about April 6, 2001 for the purpose of selling it for use as a

26  movie, published book, television show, game or other commercial application.  (FAC ¶18.)

27  According to Plaintiff, she submitted her work to Defendants with the understanding that

28  Defendants would be in a position to determine how to use her story, and she placed confidence in

1    Defendants to deal with her fairly and honestly.  (FAC ¶19.)  Plaintiff further alleges that she

2    submitted her story with the understanding that the submission was confidential and her work

3    could not be used without her permission or compensation.  (*Id.*, ¶¶19-20.)  She claims that

4    Defendants "knew or should have known" that the submission of her story was in confidence and

5    its use was conditioned upon Plaintiff's permission and compensation to Plaintiff.  (*Id.*, ¶21.)

6    However, Plaintiff does not allege *how* Defendants "knew or should have known" this

7    information.  Rather, according to Plaintiff, she simply submitted her work to Defendants without

8    any communication whatsoever.  (*Id.*, ¶18.)

9         Plaintiff alleges that Defendants "kept and reviewed" her work until approximately June

10   22, 2001, when they then notified her that "it was not their business practice to consider outside

11   story submissions."  (*Id.*, ¶¶22-23.)  According to Plaintiff, during the time Defendants had

12   possession of her work they "copied [it] and incorporated it into a movie created, produced,

13   distributed and sold by Defendants entitled 'Finding Nemo.'"  (*Id.*, ¶24.)

14        Plaintiff admits in her FAC that "Finding Nemo" was first released on May 30, 2003 and

15   that she first saw the movie on June 6, 2003.  (*Id.*, ¶¶26-27.)  According to Plaintiff, "at that point

16   [she] became aware that Defendants had copied her story . . . and had incorporated it into the

17   movie."  (*Id.*, ¶27.)  Plaintiff alleges that Defendants released the film on DVD and videocassette

18   and prepared a video game, children's books, toys and other merchandise, and live performances

19   based on "Finding Nemo," sales of which continued after May 29, 2004.  (*Id.*, ¶¶30-34.)

20        Plaintiff asserts that Defendants "received substantial revenues and profits" from the

21   "Finding Nemo" theatrical release, as well as DVDs and videocassettes, video games, toys and

22   merchandise, and live performances.  (*Id.*, ¶35.)  Plaintiff complains Defendants never gave her

23   credit or payment for use of her work.  (*Id.*, ¶36.)

24        **Procedural Background.**  On May 29, 2007, Plaintiff filed a complaint for unfair

25   competition under California Business & Professions Code § 17200 in the Santa Clara County

26   Superior Court.  Defendants removed Plaintiff's lawsuit to this Court on preemption grounds and

27   moved to dismiss on preemption and statute of limitations grounds.  Plaintiff moved to remand her

28   case to state court.  After Defendants filed their opposition to Plaintiff's remand motion, Plaintiff

1  opposed Defendants' motion to dismiss, in part, by asserting new allegations in her brief and

2  stating her intent to add a copyright infringement claim.  Plaintiff subsequently withdrew her

3  remand motion and filed the FAC, which adds a claim for copyright infringement under 17 U.S.C.

4  § 101 et seq based upon the same facts supporting her unfair competition claim.

5  <u>Argument</u>

6  When a plaintiff cannot prove any set of facts to state a claim which would entitle her to

7  relief, the complaint should be dismissed with prejudice.  Fed. R. Civ. P. 12(b)(6); *Goldberg v.*

8  *Cameron*, 482 F. Supp. 2d 1136, 1147 (N.D. Cal. 2007).  On this motion to dismiss, the facts

9  alleged in the FAC must be accepted as true, but the Court need not accept as true conclusory

10  allegations, legal characterizations, unreasonable inferences or unwarranted deductions of fact.

11  *See McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 810 (9th Cir. 1988); *Transphase Systems,*

12  *Inc. v. Southern Calif. Edison Co.*, 839 F. Supp. 711, 718 (C.D. Cal. 1993).  Plaintiff can prove no

13  set of facts which would entitle her to relief for unfair competition or copyright infringement, and

14  her FAC should be dismissed with prejudice.

15  **I.    PLAINTIFF FAILS TO STATE A CLAIM UNDER CALIFORNIA BUSINESS AND**
       **PROFESSIONS CODE SECTION 17200**
16

       **A.    Plaintiff's Section 17200 Claim is Preempted by the Copyright Act.**
17

18  It is without question that the federal Copyright Act "completely" preempts equivalent

19  state law claims.  *See, e.g., Rosciszewski v. Arete Associates, Inc.*, 1 F.3d 225, 232-33 (4th Cir.

20  1993).  *Accord Firoozye v. Earthlink Network*, 153 F. Supp. 2d 1115, 1123 (N.D. Cal. 2001);

21  *Metrano v. Fox Broadcasting Co., Inc.*, 2000 WL 979664, *3 (C.D. Cal. 2000) ("state claims that

22  are equivalent to federal copyright claims are completely preempted by the Copyright Act");

23  *Worth v. Universal Pictures, Inc.*, 5 F. Supp. 2d 816 (C.D. Cal. 1997) ("Complete preemption has

24  been found for claims brought under the Copyright Act"); *Dielsi v. Falk*, 916 F.Supp. 985 (C.D.

25  Cal. 1996) ("[a]lthough there is no Ninth Circuit authority on point, a common law claim

26  preempted by federal copyright law is clearly *completely* preempted"); *see also* 28 U.S.C.

27  §1388(a) (federal courts have exclusive jurisdiction over copyright cases); *Fleet v. CBS Inc.*, 50

28

1  Cal. App. 4th 1911, 1918 (1996) (Section 301 of the Copyright Act "expressly prohibits states

2  from legislating in the area of copyright law."); 17 U.S.C. § 301(a).

3      Plaintiff's state law unfair competition claim is preempted by the federal Copyright Act if

4  (1) the work involved falls within the "subject matter" of the Copyright Act and (2) the rights that

5  the plaintiff asserts under state law are "equivalent" to those protected by the Copyright Act.

6  *Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1212 (9th Cir. 1998); *Goldberg*, 482 F. Supp. 2d

7  at 1151 (quoting *Kodadek*, 152 F.3d at 1212).   Both prongs are met here, and Plaintiff's unfair

8  competition claim is completely preempted.

9              1.    Plaintiff's Work Comes Within the Subject Matter of the Copyright Act.

10     The Copyright Act protects literary works fixed in a tangible medium of expression from

11  which they can be perceived, reproduced or otherwise communicated.   17 U.S.C. § 102(a).

12  Plaintiff alleges she created an original literary work entitled "Squisher the Fish" in the summer of

13  2000, and that Defendants "kept and reviewed" her "original literary work" from April 6, 2001

14  through June 22, 2001.  (*Id.*, ¶¶14, 18, 22.)  These allegations place Plaintiff's work squarely

15  within the subject matter of copyright.  In fact, Plaintiff's copyright infringement claim is based on

16  the exact same work as her unfair competition claim.  Plaintiff thus admits that her work falls

17  within the "subject matter" of the Copyright Act, and that the first preemption prong is met.  *See*

18  17 U.S.C. § 301(a); *Kodadek*, 152 F.3d at 1213; *Goldberg*, 482 F. Supp. 2d at 1151.

19              2.    The Asserted Rights are Equivalent to Copyrights.

20     Preemption is mandated when a plaintiff asserts rights "equivalent" to those protected by

21  the Copyright Act and there is no extra element to take the claim outside of its umbrella.

22  *Kodadek*, 152 F.3d at 1212; *Goldberg*, 482 F. Supp. 2d at 1151.  The Copyright Act grants rights

23  "to reproduce the copyrighted work in copies," "to prepare derivative works based upon the

24  copyrighted work," "to distribute copies . . . to the public," and "to display the copyrighted work

25  publicly."  *Kodadek*, 152 F.3d at 1213 (*citing* 17 U.S.C. § 106).  Plaintiff alleges Defendants

26  "*copied*" her work and incorporated it into the movie "Finding Nemo" which was "***created,***

27  ***produced, distributed and sold*** by Defendants."  (FAC, ¶24) (emphasis added).  She further

28  alleges that Defendants did not give her credit or payment for the use of her copied work.  (*Id.*,

1  ¶36.)  These are copyright allegations.

2          Under virtually identical facts, courts consistently have held that Section 17200 claims are

3  completely preempted.  In *Kodadek*, for example, plaintiff alleged defendants published and

4  placed on the market for sale products bearing images subject to plaintiff's copyright and

5  "released a cartoon derived from his drawings without his authorization and released merchandise

6  derived from his drawings without his authorization."  *Kodadek*, 152 F.3d at 1212-13.  The Ninth

7  Circuit did not hesitate to hold plaintiff's Section 17200 claim was preempted by the Copyright

8  Act.  *Id.* at 1213l; *see also Aagard v. Palomar Builders, Inc.*, 344 F. Supp. 2d 1211 (E.D. Cal.

9  2004) (unfair competition claim preempted by the Copyright Act); *Smith & Hawkin, Ltd. v.*

10  *Gardendance, Inc.*, 2004 WL 2496163, * 4 (N.D. Cal. 2004) (same).  Having solely alleged a

11  violation of rights protected by the Copyright Act in her Section 17200 claim, Plaintiff's claim is

12  squarely preempted by federal law.

13              a.      **Plaintiff fails to allege an extra element of breach of confidence.**

14          Plaintiff ineffectively tries to distinguish her state law unfair competition claim from those

15  preempted in *Kodadek*, *Aagard*, and *Gardendance* by attempting to allege a breach of confidence.

16  Plaintiff's attempt fails.  "An actionable breach of confidence will arise when an idea, whether or

17  not protectable, is *offered to another in confidence*, and is *voluntarily received by the offeree in*

18  *confidence* with the understanding that it is not to be disclosed to others, and is not to be used by

19  the offeree for purposes beyond the limits of the confidence without the offeror's permission."

20  *Faris v. Enberg*, 97 Cal.App.3d 309, 323 (Cal. App. 2 Dist. 1979) (emphasis added).  The mere

21  submission of an idea, without more, is insufficient to establish a confidential relationship:

22          In order to prevent the unwarranted creation or extension of a monopoly and
          restraint on progress in art, *a confidential relationship will not be created from the*
23          *mere submission of an idea to another.*  There must exist evidence of the
          communication of the confidentiality of the submission or evidence from which a
24          confidential relationship can be inferred.

25  *Id.* at 323  (emphasis added).  Plaintiff fails to allege that she *communicated* the confidential

26  nature of her literary work to Defendants.  She does not explain how Defendants would know that

27  her literary work was to be kept confidential, let alone that Defendants voluntarily accepted

28  Plaintiff's submission under her terms.  Upon receiving Plaintiff's unsolicited submission,

1  Defendants returned it to her with a note stating that it was not their business practice to take

2  outside submissions.  Such a response would provide no inference of a confidential relationship.

3  Indeed, the opposite is true.  Such a generic response about a general business practice would

4  reflect the lack of any relationship whatsoever between Plaintiff and Defendants, and certainly

5  would refute any theory that Defendants voluntarily accepted Plaintiff's submission under her so-

6  called unarticulated "confidential" terms.

7         Moreover, in breach of confidence cases, courts require that the plaintiff demonstrate that

8  the recipient of a literary work have actual knowledge — *before* receiving the submission — that

9  the plaintiff expected the idea or literary work to be kept confidential.  *See, Davies v. Krasna*, 245

10 Cal.App.2d 535, 547 (1966) ("***It must be made clear that a confidential disclosure cannot be***

11 ***predicated merely upon the statement of the originator that he is submitting his idea in***

12 ***confidence.  Either there must be a pre-existing relationship of trust and confidence...or the***

13 ***person to whom disclosure is made must agree to hold the idea in confidence and at least***

14 ***impliedly agree not to use it or disclose it to others.***") (emphasis added); *Tele-Count Engineers,*

15 *Inc. v. Pacific Telephone and Telegraph Co.*, 168 Cal.App.3d 455, 464 (1985) ("Thus, in all cases

16 the gravamen of the tort is an understanding between the parties that an idea is offered upon a

17 condition of confidence."); *Balboa Insurance Co. v. Trans Global Equities*, 218 Cal.App.3d 1327,

18 1345 (1990) (citing *Faris* and noting "[t]here must exist evidence of the communication of the

19 confidentiality of the submission or evidence from which a confidential relationship can be

20 inferred"); *see also Aliotti v. R. Dakin & Co.*, 831 F.2d 898 (9th Cir. 1987) (no evidence that

21 defendant knew the information was disclosed in confidence or the parties agreed the confidences

22 would be maintained).

23        No court has found a confidential relationship without this subjective knowledge element.

24 *See id.*  Yet, Plaintiff fails to allege that she communicated to Defendants in any way that her work

25 was confidential, let alone the additional required circumstance that Defendants understood and

26 agreed to such a confidentiality demand before she submitted her work.  Plaintiff only alleges that

27 she unilaterally submitted her work to Defendants under un-communicated terms she wished they

28 would accept, nothing more.  (FAC, ¶18-20.)

DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

1    Even where plaintiffs have alleged more supporting facts than Plaintiff alleges here, courts

2  have not hesitated to find that breach of confidence claims fail. In *Idema v. Dreamworks*, 162

3  F.Supp.2d 1129, 1190-91 (C.D. Cal. 2001), for example, the court dismissed a breach of

4  confidence claim on the grounds that the claim was preempted by the Copyright Act. There,

5  plaintiff alleged that the work was submitted and marked confidential and that defendants

6  breached the "understood" confidence when they "used" the submitted work. The court found the

7  claim depended on defendants' "use" of the work and that plaintiff Idema failed to allege facts

8  supporting a confidential relationship. The end result: Idema had at most pled a breach of an

9  implied promise not to use the work, which was squarely preempted by the Copyright Act. That is

10  the very situation Plaintiff finds herself in here.

11    The court similarly found a breach of confidence claim failed in *Design Art. v. National

12  Football League Properties, Inc.*, 2000 WL 33151646 (C.D. Cal. 2000). There, plaintiff alleged

13  that an implied obligation existed between the parties when plaintiff transmitted the work at issue

14  in confidence, and further alleged that the implied obligation was breached by defendants'

15  "converting, assuming, encumbering and/or improperly utilizing the subject work" without

16  consent. The *Design Art* court found these allegations constituted breach of an implied obligation

17  not to use, but not a breach of confidence, and that plaintiff's action was preempted by federal

18  copyright law. And, in *Anderson*, 1989 WL 206431, the court dismissed a breach of confidence

19  claim where plaintiff's allegations failed to incorporate the extra element necessary to avoid

20  preemption by alleging the existence of an actual confidential relationship. *Id.* at *5. Here,

21  Plaintiff does not even allege that she marked her literary work "confidential" or that she

22  communicated in any way to Defendants that her literary work was confidential. For these reasons

23  alone, her unfair competition claim does not assert the "extra" element of breach of confidence.

24    Furthermore, there are no other circumstances here that would begin to support inferring a

25  confidential relationship between Plaintiff and Defendants. *Faris* explains that a confidential

26  relationship can be inferred where there is an implied-in-fact contract, the submitted work was

27  protected by reason of "novelty and elaboration," or that a particular relationship, such as a

28  partnership, existed. *Faris*, 97 Cal. App. 3d at 323. Plaintiff has not alleged an implied-in-fact

DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

1    contract, nor could she.[1]  Even if there were a bare allegation of novelty, without an understanding

2    between the parties that Plaintiff's work would be kept confidential, no breach of confidence claim

3    is stated.  *Tele-Count Engineers*, 168 Cal.App.3d at 464.  An understanding of confidentiality

4    between the parties is an essential element of such a charge: "Thus, in all cases the gravamen of

5    the tort is *an understanding* between the parties that an idea is offered upon a condition of

6    confidence."  *Id.* at 464 (emphasis added).  *Tele-Count* further advises that such an understanding

7    cannot arise "absent 'evidence of knowledge of confidence.'"  *Id.* at 465.  And "[a]n opportunity

8    to reject is mandatory if the defendant is to be charged with having voluntarily assumed the

9    obligation to maintain the confidentiality of disclosed information."  *Id.*  Plaintiff does not allege

10   that she had an understanding *with* Defendants that her work would be kept in confidence, *how*

11   Defendants actually had knowledge of the confidentiality of her work, or that Defendants had the

12   opportunity to reject her work.  Plaintiff did not inform Defendants, before submitting her work or

13   at any other time, that she considered the work confidential or that she wanted to be paid.  Thus,

14   Defendants had no opportunity to reject the work, or to reject Plaintiff's undisclosed terms. *Tele-*

15   *Count* therefore requires federal preemption.  *Id.* at 464-66.

16        Even accepting Plaintiff's allegations as true, there is no support for any confidence or

17   trust theory here.  There was not even any communication between Plaintiff and Defendants from

18   which one could infer that Defendants solicited or accepted such trust.  Indeed, the alleged

19   response setting forth Defendants' business practice of routinely rejecting unsolicited ideas belies

20   any notion of any relationship between the parties, let alone one of trust or confidence.  Simply

21   put: Plaintiff sent her work to Defendants without solicitation and no court has ever held that this

22   unilateral act creates a confidential relationship.  *Faris*, the seminal California case on breach of

23

24        [1]  According to *Faris*, for an implied-in-fact contract Plaintiff must show: she prepared the work, she

25   disclosed it to Defendants for sale, Defendants *voluntarily accepted* the disclosure knowing the conditions
     on which it was tendered, *i.e.* that Plaintiff expected compensation, and the reasonable value of the work.

26   *Faris*, 97 Cal. App. 3d at 318; *see also Grosso v. Miramax Film Corp.*, 383 F.3d 965, 967 (9th Cir. 2004).
     Here, Plaintiff does not, and cannot, claim Defendants voluntarily accepted the submission of her work

27   knowing that she intended to be paid.  "*[A]n obligation to pay [cannot] be inferred from the mere fact of*
     *submission*."  *Faris*, 97 Cal. App. 3d at 319 (emphasis added).

28

1  confidence, makes clear "*a confidential relationship will not be created from the mere*

2  *submission of an idea to another*." *Faris*, 97 Cal.App.3d at 323 (emphasis added).  Plaintiff's

3  unfair competition claim is preempted.

4           b.       **Plaintiff fails to allege an "extra" element of fraudulent
                     misrepresentation.**

5           Plaintiff may also argue that her unfair competition claim alleges the extra element of

6  fraudulent misrepresentation.  It does not.  Plaintiff does not allege that Defendants communicated

7  to her in anyway, other than to say they do not accept outside submissions.  Even assuming

8  misrepresentation or deceit were alleged, such allegations could not save her state law claim from

9  preemption.  "Courts do not automatically conclude that, if misrepresentation or deceit is alleged,

10 a claim is not preempted by the Copyright Act."  *Terarecon, Inc. v. Fovia, Inc.*, 2006 WL

11 1867734, *4 (N.D. Cal. 2006).  The court in *Valente-Kritzer Video v. Pinckney*, 881 F.2d 772 (9th

12 Cir. 1989), found the plaintiff alleged an extra element beyond a copyright claim where it claimed

13 defendant intentionally misrepresented its intent to perform a contract.  *Id.* at 776.  Similarly, in

14 *Dielsi v. Falk*, 916 F. Supp. 985 (C.D. Cal. 1996), the court found the plaintiff alleged an extra

15 element where he claimed defendants fraudulently promised they would honor plaintiff's

16 copyrighted work and compensate him for it, while concealing that they were making a television

17 show based on the work.  *Id.* at 991-92.  In contrast, the Plaintiff here does not allege Defendants

18 made any promises to her about her work or anything else.  At most, Plaintiff alleges that

19 Defendants implied they would not copy her work without her permission.  That is a copyright

20 claim, not a fraudulent misrepresentation claim.  *See Idema*, 162 F.Supp.2d at 1190-91.

21        Plaintiff's third attempt to craft a claim that would not be preempted by the Copyright Act

22 fails as woefully as her first.  Plaintiff's work plainly falls within the subject matter of copyright,

23 Plaintiff alleges Defendants *copied* her work without authorization, and Plaintiff has not and

24 cannot allege facts sufficient to support either a breach of confidence or a fraudulent

25 misrepresentation claim.  Thus, her unfair competition claim is preempted.

26     **B.      Plaintiff's Section 17200 Claim is Barred by the Statute of Limitations.**

27        Even if Plaintiff could properly allege a Section 17200 claim, that claim would be time-

28

1  barred.  Section 17200 has a four year statute of limitations.  Cal. Bus. & Prof. Code § 17208.  The

2  statute of limitations began to run when Plaintiff knew or should have known that Defendants

3  allegedly used her work.  Here, given the public nature of Defendants' allegedly wrongful

4  conduct, Plaintiff should have known Defendants allegedly used her work at least by (and really

5  before) the general theatrical release of "Finding Nemo" on May 30, 2003.

6      "Finding Nemo," like most major motion pictures, enjoyed a significant amount of

7  publicity *before* it was released.  (*See* Request for Judicial Notice; Roberts Dec., Ex. C (August

8  19, 2002 *Business Week* Online article reporting "Pixar's upcoming schedule includes Finding

9  Nemo, about a clownfish named Marlin who lives in the Great Barrier Reef with his son, Nemo);

10  *id.*, Ex. D (March 6, 2003 *USA Today* article describing the film as "the story of a widower clown

11  fish who tries to find his only son after the small fry is abducted by an Australian dentist for his

12  aquarium); *id.*, Exs. A, B, E-L.)  Many of these news articles published throughout the nation gave

13  detailed descriptions of the basic plot and the names of the main characters.  *Id.*  Additionally,

14  Defendants conducted a major marketing, merchandising, and advertising campaign for "Finding

15  Nemo" prior to the actual theatrical release date.  As early as April 2002, newspaper articles

16  announced the summer 2003 release of "Finding Nemo," "an underwater adventure."  (Request for

17  Judicial Notice; Roberts Dec., Ex. A.)  And, by May 26, 2003 – before the May 30, 2003 release –

18  detailed descriptions of the basic plot and the names of the main characters appeared in articles

19  from the *LA Times* to *Time Magazine*.  (Request for Judicial Notice; Roberts Dec., Exs. A-I.)

20      In light of the substantial publicity surrounding the movie's release, Plaintiff should have

21  known of Defendants' alleged copying prior to May 30, 2003.  Even if Plaintiff did not read the

22  specific news articles attached to Defendants' Request for Judicial Notice, she cannot dispute that

23  the following facts are true and judicially noticeable:  Before May 30, 2003 — "Finding Nemo"

24  was shown in theaters; its general plot, story line and characters were widely reported upon in the

25  national press; it was heavily advertised in trailers preceding other movies and on television; it

26  was publicized that Defendants would develop video games based on the film; and Defendants

27  extensively publicized that they planned a wide-ranging marketing campaign to support the new

28  Disney/Pixar release.  (*See* Request for Judicial Notice.)

-13-
DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

1    Accordingly, Plaintiff should have been well aware of the basic plot and names and

2  likenesses of the main characters in "Finding Nemo" prior to May 30, 2003.  The massive national

3  publicity surrounding the release of a major, widely anticipated motion picture by the world's top

4  animators leads to one conclusion:  Plaintiff should be charged with constructive knowledge of the

5  copying she alleges occurred here, especially since she should have had a heightened sensitivity to

6  any Disney release given her earlier interest in working with that company.  Thus, even if

7  Plaintiff's state law unfair competition claim were not squarely preempted, it would be subject to

8  immediate dismissal under the applicable four year limitations period.  Fed. R. Civ. P. 12(b)(6).

9  **II.    PLAINTIFF'S COPYRIGHT INFRINGEMENT CLAIM IS BARRED BY THE STATUTE OF LIMITATIONS.**

10    The statute of limitations for copyright infringement is three years.  17 U.S.C. § 507.  The

11  cause of action accrues when the copyright holder "has knowledge of a violation *or is chargeable*

12  *with such knowledge.*"  *Polar Bear Productions, Inc. v. Timex Corp.*, 384 F.3d 700, 706 (9th Cir.

13  2004)(emphasis added); *Roley v. New World Pictures, Ltd.*, 19 F.3d 479, 481 (9th Cir.

14  1994)(same); *Wood v. Santa Barbara Chamber of Commerce, Inc.*, 507 F. Supp. 1128, 1135 (D.

15  Nev. 1980), *aff'd*, 705 F.2d 1515 (9th Cir. 1983); *but see Los Angeles News Service v. Reuters*

16  *Television Intern., Ltd.*, 149 F.3d 987, 992 (9th Cir. 1998) ("A claim accrues when an act of

17  infringement occurs, not when consequent damage is suffered); *Fantasy, Inc. v. La Face Records*,

18  1997 WL 627544 (N.D. Cal. 1997) ("The statute of limitations in a copyright infringement action

19  begins to run with the alleged infringement occurred").  A plaintiff cannot claim he or she did not

20  discover the defendant's infringing conduct until a later date if such lack of knowledge would not

21  be reasonable under the circumstances.  *See Polar Bear Productions*, 384 F.3d at 706; *Goldberg v.*

22  *Cameron*, 482 F. Supp. 2d 1136 (N.D. Cal. 2007) (copyright infringement claim for the

23  *Terminator* movie time-barred because "no reasonable finder of fact could conclude that plaintiff's

24  asserted lack of knowledge of the alleged infringement was reasonable").

25    This case demonstrates a complete disregard of the statute of limitations for copyright

26  claims.  ***Plaintiff admits that she saw the motion picture "Finding Nemo" on June 6, 2003***.

27  (FAC ¶27.)  Her copyright claim therefore expired on June 6, 2006 — nearly one year before she

28

1  filed her original complaint and nearly a year and a half before she first asserted copyright

2  infringement claim.  Publicly available information properly subject to judicial notice establishes

3  that "Finding Nemo" DVDs and videocassettes were released on November 4, 2003.  Plaintiff's

4  copyright infringement claim based on these sales therefore expired on November 4, 2006 —

5  more than six months before she brought the present lawsuit and nearly a year before she brought

6  a copyright infringement claim.  Thus, without question Plaintiff's copyright infringement claim

7  based on the motion picture's theatrical, DVD and videocassette releases are time barred.  It would

8  also be unreasonable under the circumstances set forth in the FAC — and set forth in the

9  documents for which Defendants seek judicial notice — for Plaintiff not to have knowledge of

10  video games, live performances and merchandising before May 29, 2003, and Plaintiff's copyright

11  claims based on those materials also fail as a matter of law.

1.  <u>Plaintiff's Copyright Claim Based on the Theatrical Release of "Finding Nemo" is Time-Barred.</u>

12  
13  Plaintiff's infringement cause of action based on the theatrical release of "Finding Nemo"

14  accrued at least by May 30, 2003, when the motion picture was released to the general public.  *See*

15  *Polar Bear Productions*, 384 F.3d at 706; *Goldberg*, 482 F. Supp. 2d 1136.  As explained above,

16  the general release was widely publicized even before May 30, 2003, and Plaintiff, at minimum,

17  should be charged with constructive knowledge of this earlier time period.  *See* Section I.B.,

18  above.  However, since Plaintiff *admits* that she saw "Finding Nemo" in the theaters on June 6,

19  2003, there can be no dispute that her cause of action based on the theatrical release accrued at

20  least as of that date.  *Roley*, 19 F.3d at 481 (cause of action for copyright infringement accrued

21  when plaintiff screened the allegedly infringing motion picture); (FAC, ¶27.)  Plaintiff did not file

22  this lawsuit until May 30, 2007.  Thus, even if the Court does not charge Plaintiff with

23  constructive knowledge of the alleged infringement before or as of the release of the film,

24  Plaintiff's own allegations demonstrate that any claim of copyright infringement based upon the

25  theatrical release of "Finding Nemo" is time-barred.

26  Plaintiff's allegation that Defendants continued to show "Finding Nemo" in theaters after

27  May 30, 2004 does not save her claim from dismissal.  Courts do not treat each individual

28

1   showing of a motion picture or each individual sale of a DVD or videocassette as a separate act of

2   infringement.  *See, e.g., Roley*, 19 F.3d at 480-81; *Kourtis v. Cameron*, 419 F.3d 989, 999-

3   1000 (9th Cir. 2005).  Indeed, neither *Roley* nor *Kourtis* even discuss whether the allegedly

4   infringing films were shown in theaters within three years of the filing of the complaint; instead

5   they focus on the initial release dates.  *Id.*  Because Plaintiff admits that she saw "Finding Nemo"

6   on June 6, 2003, her copyright claim based on the theatrical release of the film is, without

7   question, time barred.

8          2.    Plaintiff's Copyright Claim Based on DVD and Videocassette Sales of
                 "Finding Nemo" is Also Time-Barred.

9

10          Plaintiff alleges the release of "Finding Nemo" DVDs and videocassettes also form the

11   basis of her copyright infringement claim.  (FAC, ¶30.)  She does not allege when the initial DVD

12   and videocassette sales and rentals took place, and instead hedges by stating that sales and rentals

13   continued after May 30, 2004.  (*Id.*)  However, as explained above, sales and rentals after the

14   initial date of release for DVDs and videocassettes cannot save an otherwise time-barred copyright

15   claim — courts simply do not treat subsequent sales and rentals as separate acts of infringement.

16   *See, e.g., Roley*, 19 F.3d at 480-81; *Kourtis*, 419 F.3d at 999-1000.  Thus, the pivotal date for any

17   infringement claim based on "Finding Nemo" DVDs and videocassettes is when Plaintiff can be

18   charged with knowledge of the initial release.  That date is November 4, 2003.  (Request for

19   Judicial Notice; Roberts Dec., Exs. M-S.)

20          In its first two weeks on store shelves, "Finding Nemo" became the best-selling DVD of

21   all time.  (Request for Judicial Notice; Roberts Dec., Ex. M) (November 7, 2003 article in the

22   *Lexington (KY) Herald-Leader* saying that the "Finding Nemo" two-DVD set hit stores Tuesday);

23   *id.*, Ex. N (November 18, 2003 *LA Times* article calling "'Nemo' . . . the biggest-selling initial-run

24   DVD, with 15 million units sold in its first two weeks"); *id.*, Ex. O (November 19, 2003 *Boston

25   Herald* article reporting that "in just two weeks, 'Finding Nemo' has replaced 'The Lord of the

26   Rings: The Fellowship of the Ring' as the best-selling DVD title of all time"); *id.*, Exs. P-S.)

27          Given this massive, national publicity, Plaintiff cannot reasonably claim that she failed to

28   discover the release of the "Finding Nemo" DVD by November 2003, especially since by that time

she already had seen the film in a theater and presumably believed her "Squisher the Fish" work had been copied. *See Polar Bear Productions*, 384 F.3d at 706. "[T]he plaintiff has a duty of diligence: it is not enough that he did not discover he had a cause of action, if a reasonable man could have." *Id.* at 707. Upon discovery of a possible infringement when she admits that she saw the motion picture "Finding Nemo" on June 6, 2003, Plaintiff should have exercised "reasonable diligence" to discover all products containing the alleged infringement. *Bridgeport Music, Inc. v. Robert Hill Music*, 2006 WL 3720348, *9 (M.D. Tenn. 2006). A reasonable person, having seen the film and believed it infringed her work, would have been on the lookout for additional acts of alleged infringement. For these reasons, Plaintiff should be charged with constructive knowledge of the November 4, 2003 DVD release, and her copyright claim based on DVD and videocassette sales is time-barred and should be dismissed with prejudice.

> 3.  Plaintiff's Copyright Claim Based on Video Games, Live Performances and Merchandising Likewise Should Be Dismissed With Prejudice.

After viewing "Finding Nemo" on June 6, 2003 (FAC, ¶ 27), and after "Finding Nemo" became the best-selling first-run DVD of all time in just two weeks, one would expect that Plaintiff, who believed Defendants copied her work, would have filed suit. She did not. She waited and waited until May 29, 2007, after Defendants had developed, introduced and sold video games, toys, and other merchandise, and presented live performances based on the successful film, before she filed her original state court complaint. Plaintiff then waited even longer before deciding to finally bring a copyright infringement claim. Plaintiff cannot reasonably claim she did not discover Defendants' sales of video games, its live performances or other merchandising based on the motion picture "Finding Nemo." *See Polar Bear Productions*, 384 F.3d at 706. A reasonable person would have known to be on the lookout for additional acts of alleged infringement. *Id.* at 707; *Bridgeport Music*, 2006 WL 3720348 at *9. Having waited so long before filing suit, Plaintiff should not be allowed to proceed with her stale claim as to Defendants' video games, toys, merchandise, and live performances. *See Danjaq LLC v. Sony Corp.*, 263 F.3d 942 (9th Cir. 2001) (barring copyright infringement claim based on re-release of James Bond films, notwithstanding the fact that the statute of limitations had not yet run); *see also Chirco v.*

1    *Crosswind Communities, Inc.*, 474 F.3d 227 (6th Cir. 2007).

2    **III.**    **PLAINTIFF FAILS TO STATE A CLAIM FOR COPYRIGHT INFRINGEMENT BECAUSE "FINDING NEMO" AND "SQUISHER THE FISH" ARE NOT SUBSTANTIALLY SIMILAR.**

3

4    A simple review of "Squisher the Fish" and "Finding Nemo" demonstrates as a matter of

5 law that the two works are not substantially similar (indeed, they are completely different), and

6 that Plaintiff cannot allege a viable infringement claim. *See Funky Films, Inc. v. Time Warner*

7 *Entertainment*, 462 F.3d 1072, 1076 (9th Cir. 2006). The lack of substantial similarity between

8 the two works amply demonstrates that no reasonable trier of fact could find that Defendants

9 copied Plaintiff's work, and for this independent reason Plaintiff's copyright infringement claim

10 should be dismissed with prejudice.

11    The substantial similarity test has two components: the extrinsic test, which is determined

12 as a matter of law by the court, and the intrinsic test. *Funky Films*, 462 F.3d at 1077. When a

13 plaintiff cannot satisfy the extrinsic test, she cannot prove copyright infringement as a matter of

14 law, and her claim should be dismissed. *Id.* The extrinsic test focuses on "articulable similarities

15 between plot, themes, dialogue, mood, setting, pace, characters, and sequence of events." *Funky*

16 *Films*, 462 F.3d at 1077. In inquiring whether there is substantial similarity between the works

17 under the extrinsic test, courts must take care to *only consider the protectable elements*. *Id.*

18 "Protectable expression includes the specific detail of an author's rendering of ideas. However,

19 scenes a faire, which flow naturally from generic plot-lines, are not protectable." *Id.* "Scenes a

20 faire are incidents, characters, or setting which are as a practical matter indispensable, or at least

21 standard, in the treatment of a given topic." *Chase-Riboud v. Dreamworks, Inc.*, 987 F. Supp.

22 1222, 1227 (C.D. Cal. 1997).

23    Plaintiff has not, and cannot, allege any similarities between her work and the "Finding

24 Nemo" motion picture, DVDs, video games, live performances, or merchandising. A comparison

25 of "Squisher the Fish" and "Finding Nemo" reveals that the plot, themes, dialogue, mood, setting,

26 pace, characters, and sequence of events are completely different from one another. The *only*

27 possible similarities between the two works are that the story takes place in the ocean; the main

28 character is a fish; the story includes other fish, a turtle, divers and a reef; and some characters are

1  captured and put into a fish tank.  (*Compare* Roberts Dec., Exs. T and U.)[2]  These elements are

2  unprotectable as a matter of law, and Plaintiff's copyright infringement claim should not be

3  permitted to further take up the Court's, or the parties', resources and time.  That claim should be

4  dismissed with prejudice now.

5      A.    <u>Characters</u>

6      The characters in "Finding Nemo" and Plaintiff's "Squisher the Fish" are completely

7  different and highlight the utter lack of similarity between the two works.  The characters in

8  "Finding Nemo," unlike those in "Squisher the Fish," are fully developed both visually and

9  emotionally.  (Roberts Dec., Ex. U.)  Marlin and his son Nemo are orange clownfish with white

10 stripes around their bodies, and wide eyes.  They each also have special defining characteristics

11 beyond being clownfish.  For example,  Nemo is a curious, resilient young fish, yearning for

12 independence, and he has a deformed fin.  Marlin is an overprotective father who needs to learn to

13 let go and lighten up.  The other "Finding Nemo" characters are similarly developed.  Marlin's

14 loyal friend Dory is an optimistic, social and caring - but forgetful - blue tang fish.  Crush and

15 Squirt are "chill" sea turtles who ride the waves of the East Australian Current.  Bruce, Chum, and

16 Anchor are sharks that hold 12-step meetings to curb their hunger for fish.  And, Nigel, a pelican,

17 enjoys swapping stories with Nemo and his fish tank friends.

18     None of these characters are found in "Squisher the Fish."  Plaintiff's work does not even

19 include a father and a son.  (Request for Judicial Notice; Roberts Dec., Ex. T.)  There is very little

20 description of Squisher, and the only characteristic he shares with Nemo is that he is a young fish.

21 None of Squisher's friends is similar to the loyal but forgetful, Dory.  The loggerhead turtle named

22 Frankie does not have the "surfer dude" attitude of Crush and Squirt.  And Squisher does not meet

23

24

25     [2]  Because Plaintiff refers to "Finding Nemo" and "Squisher the Fish" in her FAC, but did not attach

26 them, they are central to Plaintiff's claim, and the copies attached to the Roberts Declaration are authentic,
   the Court may consider the copies attached as Exhibits T and U to the Roberts Declaration in connection

27 with Defendants' motion to dismiss.  *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994) (overruled on
   other grounds by *Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

28

1  any 12-step sharks or gossiping pelicans.  No reasonable fact finder could possibly find that the

2  characters in these works are substantially similar.[3]

3  **B.    Plot and Setting**

4  　　The plot and setting in the two works are also very different.  The plot of "Finding Nemo"

5  is Marlin's undersea adventures trying to find his son.  (Roberts Dec., Ex. U.)  Nemo is captured

6  by a diver early in the film when deliberately disobeying his father's rules and spends the bulk of

7  the film trying to escape a fish tank.  Marlin's adventures occur on his travels from the Great

8  Barrier Reef to Sydney, including an exciting ride on the East Australian Current.  Nemo's

9  adventures take place in a fish tank in a dentist's office in Sydney, which is decorated with kitschy

10  objects and inhabited with other fish who perform tiki-inspired rituals and dream of breaking free.

11  　　In contrast, "Squisher the Fish" is about a young fish learning about the ocean.  (Request

12  for Judicial Notice; Roberts Dec., Ex. T.)  Squisher meets some friends and learns about other fish

13  and humans.  But, he does not meet characters anywhere near as colorful, literally or figuratively,

14  as those in "Finding Nemo."  Squisher is not captured by a diver until the end of the story and thus

15  all but the very end of the story takes place in the ocean.  Although a reef is mentioned in the

16  story, there is no indication that "Squisher the Fish" lives in the Great Barrier Reef or anywhere

17  near Australia.  The fish tank in which he lives after being captured is barely described in

18  Plaintiff's work.  She mentions that there are some other inhabitants, but does not describe what

19  they look like or their personalities.  Nor does she describe the tank itself, other than that it is a

20

21  　　　[3]  Undeveloped characters, like those in "Squisher the Fish," are also not entitled to copyright
protection in the first instance.  *Olson v. National Broadcasting Co., Inc.*, 855 F.2d 1446, 1451-52 (9th Cir.

22  1988).  Copyright protection is granted for characters "who are especially distinctive."  *Id.* at 1452.
Plaintiff's characters are not.  If "the character is only the chessman in the game of telling the story," as

23  opposed to the "story being told," "he is not within the area of the protection afforded by copyright."
*Warner Bros. Pictures v. Columbia Broadcasting System*, 216 F.2d 945, 950 (9th Cir. 1954) (Sam Spade in

24  "The Maltese Falcon" is not a protected character).  For example, in *Rice v. Fox Broadcasting Co.*, 330
F.3d 1170 (9th Cir. 2003), the court found a magician that revealed the secrets behind his tricks was not

25  protected because he wore standard magician garb and his role was limited to performing and revealing
magic tricks.  *Rice*, 330 F.3d at 1175.  And, in *Cavalier v. Random House, Inc.*, 297 F.3d 815 (9th Cir.

26  2002), the court found a talking moon "can be considered a stock character for children's literature, and
directly flows from the idea of a journey through the night sky."  *Cavalier*, 297 F.3d at 825.  Here,

27  　　(footnote continued)

28

1    public aquarium.  Even more significantly, Squisher does not try to escape the fish tank like Nemo

2    does and no one in the ocean tries to find him.  A reasonable fact finder could not conclude that

3    these two works are similar in plot and setting.

4         The only similarity in plot and setting between "Finding Nemo" and "Squisher the Fish" is

5    that both are undersea adventures.  Basic plot ideas, such as this, however, are not protected by

6    copyright law.  *Cavalier*, 297 F.3d at 824.  In *Cavalier*, the Ninth Circuit found the premise of "a

7    child, invited by a moon-type character, who takes a journey through the night sky and returns

8    safely to bed to fall asleep" was not protected by copyright law.  *Id.*  Plaintiff's idea to write a

9    story about a fish in the ocean, who gets captured by a diver and put in a fish tank, is similarly not

10   entitled to copyright protection.  *Id.*

11        Moreover, any other similarities between the works, such as the common ocean setting,

12   various underwater creatures, a reef, and divers, are unprotected *scenes a faire*.  *Funky Films, Inc.*,

13   462 F.3d at 1077.  They are indispensable to a story about a fish in the ocean.  For example, in

14   *Cavalier*, the court found the night sky setting for the story "naturally and necessarily flows from

15   the basic plot premise of a child's journey through the night sky."  *Cavalier*, 297 F.3d at 824.  In

16   *Williams v. Crichton*, 84 F.3d 581 (2d Cir. 1996), the Second Circuit found "common elements of

17   electrified fences, automated tours, dinosaur nurseries, and uniformed workers were scenes-a-faire

18   that flowed from the concept of a dinosaur zoo."  *Williams*, 84 F.3d at 589.  And, in *Anderson v.

19   Paramount Pictures Corp.*, 617 F. Supp. 1 (C.D. Cal. 1985), the court found that characters

20   driving in a limousine, having a butler and chauffer, and toasting champagne at celebrations, were

21   *scenes a faire* flowing from stories about wealthy characters.  *Anderson*, 617 F. Supp. at 2.  Thus,

22   the fact that "Finding Nemo" and "Squisher the Fish" take place in the ocean, feature other ocean

23   creatures, and include divers, does not support a claim for copyright infringement.  These

24   similarities are *scenes a faire* that flow from the generic concept of an undersea adventure and are

25   not protected by copyright law.

26   _____

27   Plaintiff's truncated descriptions of talking underwater sea creatures is insufficient to warrant copyright
     protection.

28

51279/2291316.3

DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

1    **C.    Sequence**

2    The sequence of events in "Squisher the Fish" and "Finding Nemo" are dramatically

3    different. In both stories, the title character is captured by a diver and put in a fish tank. (Request

4    for Judicial Notice; Roberts Dec., Exs. T and U.) But, that is where the similarities end. Nemo is

5    captured by a diver early in Defendants' work. The entire story in "Finding Nemo" is Nemo's

6    father's attempts to get to Sydney to find Nemo and Nemo's attempts to escape from the fish tank

7    to reunite with his father. (Roberts Dec., Ex. U.) Nemo ultimately escapes and is reunited with

8    his father. The story ends with father and son living happily together in the ocean.

9    There is absolutely nothing resembling this search and reunion in "Squisher the Fish."

10    (Request for Judicial Notice; Roberts Dec., Ex. T.) Squisher is not captured by a diver until the

11    end of Plaintiff's work. Unlike Nemo, Squisher does not try to escape. He is perfectly content in

12    his new home. And, unlike Marlin and Dory, none of Squisher's ocean friends try to find him.

13    Plaintiff's work ends with Squisher in the public aquarium, away from his loved ones, but happy.

14    Courts have found similarly different plot sequences supported a finding of no substantial

15    similarity. *See Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042 (9th Cir. 1994) (sequence

16    in stories about shrinking children different because the characters were shrunk to different sizes,

17    by different means, for different reasons, with different frequency, and for different outcomes);

18    *Litchfield v. Spielberg*, 736 F.2d 1352, 1356-57 (9th Cir. 1984)(sequence of events between "ET"

19    and another extra-terrestrial story were different because the latter landed in the North Pole and

20    stayed with a family there, then traveled to Japan, the Andes Mountains, and the edge of the

21    Pacific Ocean before returning to their ship); *Anderson*, 1989 WL 206431 (sequence in Rocky

22    stories different because the only similarity was that they ended with Rocky fighting a communist

23    fighter). The different sequence of events in "Squisher the Fish" and "Finding Nemo," compels a

24    finding that the works are not substantially similar.

25    **D.    Pace**

26    The pace of "Squisher the Fish" and "Finding Nemo" are also vastly different. "Squisher

27    the Fish" is only 11 pages long. (Request for Judicial Notice; Roberts Dec., Ex. T.) The story

28    jumps from event to event in almost stream-of-consciousness-like fashion. These events are not

1  connected in any way.  Further, the story gives little indication as to whether it takes place in a

2  matter of days, weeks, months, or years.  In contrast, "Finding Nemo" is a feature-length film.

3  (Roberts Dec., Ex. U.)  It tells a fully developed story of a father and son.  The events in the film

4  move the plot forward to the ultimate goal of the reunion between the two.  In "Finding Nemo,"

5  Nemo does not age substantially during the film — he remains a little boy throughout.  In contrast,

6  "Squisher the Fish" begins when Squisher is born, continues with Squisher growing up and falling

7  in love, and ends with Squisher inside a public aquarium.  These differences in pace illustrate that

8  the two works express the generic idea of an undersea adventure in extraordinarily different ways.

9  **E.    Themes**

10  Plaintiff's "Squisher the Fish" and "Finding Nemo" also have inapposite themes.  The

11  theme of "Finding Nemo" is the father-son relationship between Marlin and Nemo, a relationship

12  completely missing from "Squisher the Fish."  Despite the film's title, Defendants' work is really

13  about Marlin.  It focuses on Marlin's evolution from an overprotective father with emotional

14  baggage, who does not really know his son, to the father who understands that he has to put the

15  past behind him and should not keep his promise to "never let anything happen" to Nemo.

16  The themes of Plaintiff's work are far less clear.  Plaintiff focuses on friendship and love,

17  introducing Squisher to a handful of ocean friends and providing him a love interest in Dot.

18  Squisher's friends do not appear to be a loyal as Nemo's, however, as none of them try to rescue

19  him from the fish tank.  There are also environmental undertones in Plaintiff's work, as much of

20  the 11-page story is devoted to superficially describing the many different creatures that live in the

21  ocean and the characters singing about how wonderful it is to be alive.  The story concludes with

22  teaching: "Take care of our oceans.  Take care of our lands."  Regardless of which of these themes

23  were intended by Plaintiff, a reasonable fact finder could not find them similar to the theme in

24  "Finding Nemo."

25  **F.    Dialogue**

26  The dialogue in "Finding Nemo" and "Squisher the Fish" is not remotely similar.  Again,

27  "Finding Nemo" is a feature-length film.  The dialogue is detailed and developed, not simplistic

28  and high level.  "Finding Nemo" is also not a musical.  With the exception of some humorous but

1   nonsensical singing by forgetful Dory, the story is not told through song.

2          In "Squisher the Fish," there is little dialogue between the characters.  (Request for Judicial

3   Notice; Roberts Dec., Ex. T.)  None of the characters speaks more than a sentence or two.  When

4   they do, they are singing about their surroundings and how wonderful it is to be alive.  Indeed, one

5   and a half pages of Plaintiff's 11-page work are devoted to characters singing.  Even when the

6   characters are not singing, it seems that Plaintiff attempted to make her work rhyme.  The

7   sentences are short and simple, and have the sing-song tone one would expect only in a children's

8   book.  The dialogue is therefore very different than the highly developed dialogue in "Finding

9   Nemo."  Once again, the generic idea of an underwater adventure is expressed in a very different

10  way in "Squisher the Fish" and "Finding Nemo."

11         In short, "Squisher the Fish" and "Finding Nemo" are completely different works.  They

12  have different characters, sequence, pace, themes, plots, settings, and dialogue.  At most, any

13  possible similarity between "Finding Nemo" and its related products and "Squisher the Fish" are

14  unprotectable *scenes of faire* that would be common to any underwater ocean story.  Given the

15  contents of Plaintiff's copyright deposit, it is clear that she cannot state a claim for copyright

16  infringement based on "Finding Nemo" or any materials based on it.  Plaintiff's copyright claim,

17  therefore, should therefore be dismissed with prejudice now, without additional litigation.

18                                       **<u>Conclusion</u>**

19         For the foregoing reasons, this Court should dismiss Plaintiff's First Amended Complaint

20  with prejudice.  She simply cannot cure any of the deficiencies in her tardy, preempted and

21  substantively flawed action.

22  DATED:  November 15, 2007            QUINN EMANUEL URQUHART OLIVER &
                                        HEDGES, LLP
23

24

25                                      By   /s/
                                           Claude M. Stern
26                                         Attorneys for Defendants The Walt Disney
                                           Company, Walt Disney Pictures, Disney Book
27                                         Group, LLC, Pixar, and Disney Enterprises, Inc.

28